John JACKSON, Plaintiff-Appellant,

v.

RKO BOTTLERS OF TOLEDO, INC.,
Defendant-Appellee.

No. 82–3803.

United States Court of Appeals,
Sixth Circuit.

Argued April 19, 1984.

Decided Aug. 30, 1984.

Dennis P. Strong, Gordon A. Senerius (argued), Bayford, Senerius & Vaporis, Toledo, Ohio, for plaintiff-appellant.

Peter R. Casey, III (LC) (argued), John T. Landwehr, Eastman & Smith, Toledo, Ohio, for defendant-appellee.

Before KEITH and MARTIN, Circuit Judges, and HILLMAN, District Judge.[*]

HILLMAN, District Judge.

Plaintiff filed suit under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (1976), and, 42 U.S.C. § 1981 (Section 1981), claiming that defendant discriminated against him on account of his race. Jackson, who is black, claimed that RKO Bottlers of Toledo (RKO) discriminatorily refused to promote him and then unlawfully discharged him in retaliation for his having filed discrimination charges. Following a bench trial, the district court filed a memorandum opinion concluding that plaintiff failed to prove that defendant unlawfully discriminated against him in either the matter of promotion or discharge. Judgment was entered for defendant and plaintiff appealed.

## FACTS

Plaintiff, John Jackson, is a black male. Defendant, RKO Bottlers of Toledo, Inc., manufactures, bottles and distributes soft drinks. Plaintiff began work in 1951 as a general laborer with Variety Club, defendant's predecessor, located in Toledo, Ohio. In 1966, defendant purchased Variety Club, including Variety Club's franchise for bottling and distributing Pepsi Cola. In 1969, RKO built a bottling and distribution facility on Hill Avenue in Toledo, Ohio (Hill Avenue). Plaintiff was offered, and accepted, the opportunity to move to Hill Avenue as working line foreman. In 1974, RKO made plaintiff a salaried supervisory employee, changing his title from working line foreman to Production Supervisor.

From 1969 until 1978, the Plant Superintendent at the Hill Avenue facility was Dan Starsky. Starsky testified that plaintiff functioned as his assistant during the nine-year period Starsky was Plant Superintendent at Hill Avenue. Plaintiff filled in for Starsky during periods when Starsky was absent, albeit with instructions left by Starksy. Plaintiff was responsible for supervising approximately 50 employees. In April of 1978, Starsky received a promotion to become general manager at the RKO facility in Muncie, Indiana. Initially, Robert Johnson (Johnson), the General Manager of RKO in Toledo, decided to replace the Plant Superintendent position with a "team concept" used at other bottling plants. Johnson made plaintiff production manager, another employee, Pete Kerner, warehouse manager, and a third employee, Frank Taylor, maintenance manager of the Hill Avenue facility. Thereafter, Johnson became dissatisfied with the team management system and decided to appoint one individual as Plant Superintendent. He considered plaintiff, Kerner and Taylor for the position, but only plaintiff and Kerner

* Honorable Douglas W. Hillman, District Judge, United States District Court for the Western District of Michigan, sitting by designation.

received serious consideration. In June, 1978, Kerner was selected over plaintiff for the position of Plant Superintendent.

Kerner had also worked at Variety Club since 1951. From 1969 until 1972, Kerner was the Assistant Plant Superintendent at Variety Club. There was much conflict, even among defendant's own witnesses, concerning the extent of Kerner's autonomy as Assistant Plant Superintendent at the Variety Club facility from 1969 until 1972. This issue was relevant to plaintiff's contention that his (Jackson's) skills and experience were superior to Kerner's relative to the Hill Avenue Plant Superintendent position. Defendant, on the other hand, stressed Kerner's history of having managed the Variety Club facility independently and effectively. Kerner testified that Starsky, Plant Superintendent at Hill Avenue, had little involvement at Variety Club and that he (Kerner) reported to Bill McCluskey, who was Plant Manager at Variety Club. Starsky, however, testified that he (Starsky) was Kerner's boss. Starsky further testified that he went over to Variety Club every week or so and probably told Kerner what to buy and what to schedule. Jim Snyder, Vice President and General Manager of RKO from 1969 until 1974, testified that Starsky went to Variety Club once or twice a week, and that he himself probably went once every two weeks.

In 1972, the Variety Club operation was closed in favor of the more modern Hill Avenue facility. Kerner then became night warehouse supervisor at the Hill Avenue facility, supervising approximately 10 to 15 employees. It is neither necessary nor proper, for purposes of this appeal, for this court to resolve conflicting evidence regarding the respective experience and qualifications of plaintiff and Kerner with regard to the Plant Superintendent position at Hill Avenue, and we do not do so.

On July 12, 1978, plaintiff filed charges of employment discrimination with the Ohio Civil Rights Commission and the United States Equal Employment Opportunity Commission alleging that he had not been promoted to the position of Plant Superintendent because of his race. On November 15, 1978, he filed this action. Plaintiff alleges that, subsequent to filing this lawsuit and his charges of discrimination, he was subjected to a series of retaliatory actions until his discharge effective on December 1, 1980. After filing discrimination charges, plaintiff was removed from his office. According to defendant, it was Kerner's prerogative, as Plant Superintendent, to choose his office and he chose the office occupied by plaintiff. Defendant claims that plaintiff had the option of sharing a different office with Taylor, who had remained maintenance manager, but that plaintiff declined this arrangement.

Plaintiff further claims defendant retaliated against him when Johnson allegedly urged two female employees, Carol Cowell and Beth Alexander, to file sexual harassment charges against plaintiff in May of 1979. There was conflicting evidence regarding whether Johnson in fact urged the two employees to file these charges against plaintiff, as well as the facts surrounding the underlying incident(s). Neither Cowell nor Alexander, in fact, filed sexual harassment charges.

Plaintiff further alleges that defendant retaliated against him following his filing of discrimination charges by excluding him from production management meetings and by changing his bottling schedules without notice on a number of occasions. According to plaintiff, defendant's final act of retaliation was his discharge from employment.

Plaintiff was discharged by defendant in November, 1980. The incident triggering this discharge occurred after working hours on November 22, 1980, in defendant's parking lot and involved physical contact between plaintiff and one of the defendant's hourly employees, Robert Haas (Haas). Conflicting evidence was introduced as to whether the incident was one of friendly horseplay or was a more serious assault by plaintiff against Haas. November 22, 1980, was the last day of a strike by defendant's hourly employees. During the

strike, the plant had been run by supervisory employees and hourly employees not participating in the strike. It was also the day of the University of Michigan-Ohio State football game. The mood at the plant was jovial, both by reason of the end of the strike and the football game. Television sets were placed in the plant that day in order that defendant's personnel could watch the game. On prior occasions, plaintiff and Haas had bet on football games. Plaintiff claims that on November 22, 1980, he and Haas had such a bet. This was denied by Haas.

As Haas and Taylor, the maintenance manager, were leaving the plant, plaintiff and Haas engaged in a verbal exchange about whether Haas owed plaintiff $5 from a bet on the game. Plaintiff followed Haas from the parking lot, approached him and again asked him for the bet money. As noted, the tone of this exchange, i.e. whether humorous or serious, is in dispute. In any event, plaintiff grabbed Haas's clothing and pinned him against Haas's car and then released him. Three security guards, on the premises because of the strike, observed the incident and approached plaintiff and Haas. By the time the guards walked over to the scene of the incident, plaintiff had released Haas.

Taylor, who was present during the incident, reported the incident to Johnson later that weekend after several attempts to reach him. After an investigation of the incident, the thoroughness of which was vigorously disputed, Johnson discharged plaintiff. Defendant characterizes the discharge as a reasonable response to a serious breach of company policy, and notes that plaintiff had been warned previously to never put his hands on an hourly employee. Plaintiff contests both the seriousness of the incident and whether it was the real reason for his discharge. Plaintiff characterizes it as a pretext for what in reality was a retaliatory discharge because of plaintiff's activity protected by Title VII.

## DISCUSSION

Section 703(a) of the Act, 42 U.S.C. § 2000e–2(a), makes it unlawful for an employer to discriminate against an employee because of the employee's race, and section 704(a), 42 U.S.C. § 2000e–3(a), makes it an unlawful employment practice to discriminate against an employee for filing a charge under Title VII.

A decision by a district court on the issue of discrimination, or lack thereof, under Title VII is subject to review under the clearly erroneous standard of Rule 52(a), Fed.R.Civ.P.; *Pullman—Standard v. Swint*, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982); *Anne Geisler v. Frank Folsom, Jr., et al.*, 6th Cir., 735 F.2d 991 (1984). Findings of the district court are not clearly erroneous unless, upon review of the entire record, the court is left with a definite and firm conviction that a mistake has been committed. *Godley v. Kentucky Resources Corp.*, 640 F.2d 831, 834 (6th Cir.1981). However, the clearly erroneous standard does not insulate either the trial court's conclusions of law, *Pullman-Standard*, 456 U.S. at 287, 102 S.Ct. at 1789, or factual findings that result from application of incorrect legal principles. *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 855, 102 S.Ct. 2182, 2188, 72 L.Ed.2d 606 (1982).

There is an established pattern for the allocation of proof in employment discrimination cases applicable to both of plaintiff's claims, i.e., discrimination in promotion and retaliatory discharge. According to *McDonnell-Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the plaintiff has the initial burden of establishing a prima facie case of discrimination. Plaintiff must establish facts, by a preponderance of the evidence, which if not explained, prove or give rise to an inference of unlawful discrimination. If the plaintiff successfully establishes a prima facie case, the burden is then upon the defendant to articulate a legitimate, nondiscriminatory reason or reasons for its actions. *McDonnell-Douglas Corporation v. Green*, 411 U.S. at 802, 93 S.Ct. at 1824, *Texas Department of Community Affairs v. Burdine*, 450 U.S.

248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *Albemarle Paper Company v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1974). If defendant comes forward with such a reason, plaintiff may then attempt to establish that the nondiscriminatory reason articulated by the defendant was a mere pretext for the alleged discriminatory action. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. However, the plaintiff at all times carries the ultimate burden of proving racial discrimination. Even though the burden of going forward with the evidence may shift between the plaintiff and the defendant, the burden of persuasion always remains with the plaintiff. *Haynes v. Miller,* 669 F.2d 1125, 1126–1127 (6th Cir.1982).

As noted by the Supreme Court in *U.S. Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983), an analysis of the reasons for failing to promote an employee or the reasons for his discharge raise issues for the fact finder that are both sensitive and difficult. Direct evidence in Title VII cases is usually not available. "There will seldom be 'eyewitness' testimony as to the employer's mental processes." *Id.* at 1482. For this reason, the prima facie analysis established in *McDonnell-Douglas* becomes crucial. Once a plaintiff establishes a prima facie case, he eliminates the most common nondiscriminatory reasons for plaintiff's rejection: the plaintiff's lack of qualifications or the absence of a vacancy in the position sought. *Burdine,* 450 U.S. at 253–4, 101 S.Ct. at 1093–94. Once the plaintiff's prima facie case is established, the burden shifts to the defendant employer to rebut the resulting inference of discriminatory intent. This burden shifting rule in Title VII cases is critical because in light of the prima facie case a trier of fact presumes that the employer's acts, "if otherwise unexplained, are more likely than not, based on the consideration of impermissible factors." *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978).

■ *McDonnell-Douglas* and *Burdine* establish four necessary elements applicable to plaintiff's promotion claim, for a prima facie case of disparate treatment because of race under Title VII. The plaintiff must show: (1) that he belongs to a racial minority; (2) that he applied and was qualified for a desired position for which the employer was seeking applicants; (3) that, despite his qualifications, he was rejected; and (4) that, after his rejection, the employer continued to seek applicants from persons of plaintiff's qualifications. *McDonnell-Douglas v. Green,* 411 U.S. at 802, 93 S.Ct. at 1824; *Texas Department of Community Affairs v. Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095; *Draper v. Smith Tool and Engineering Company,* 6th Cir. 728 F.2d 256 (1984).

■ Plaintiff also claims that he was discharged in retaliation for having filed suit when not promoted to Plant Superintendent. To support a claim of retaliatory discharge, plaintiff must establish: (1) that he engaged in activity protected by Title VII; (2) that he was the subject of adverse employment action; and (3) that there exists a casual link between his protected activity and the adverse action of his employer. *Burrus v. United Telephone Company of Kansas, Inc.,* 683 F.2d 339, 343 (10th Cir.1982), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1983); *Jones v. Lumberjack Meats, Inc.,* 680 F.2d 98, 101 (11th Cir.1982); *Whatley v. Metropolitan Atlanta Rapid Transit Authority,* 632 F.2d 1325, 1328 (5th Cir.1980).

The trial court correctly articulated the legal standards applicable to plaintiff's case. Neither plaintiff nor defendant disputes their accuracy. However, plaintiff challenges several of the trial court's factual findings and the application of the law to the facts generally. Upon careful evaluation of the record, we agree that several of the court's factual findings are clearly erroneous and that these errors led to erroneous conclusions of law.

We first review plaintiff's claim that he was discriminatorily denied promotion, then

his claim of retaliatory discharge, and finally his claim under 42 U.S.C. § 1981.

## Denial of Promotion

We find several of the district court's findings of fact, with respect to plaintiff's claim that he was discriminatorily denied promotion, clearly erroneous. The specific factual errors are as follows:

■ 1. The trial court found that plaintiff had not proved that he was qualified for the position of Plant Superintendent. The only evidence that plaintiff was not qualified was one statement by Johnson, defendant's general manager, that he "felt" plaintiff was not qualified for the position. However, Johnson testified that plaintiff was seriously considered for the position of Plant Superintendent. Johnson articulated no objective criteria which plaintiff did not meet. Plaintiff had functioned as assistant to the former Plant Superintendent, Starsky, for nine years. There was evidence that plaintiff lacked experience in the areas of sales and night loading. However, defendant never offered, nor did the court find, that experience in these areas was reasonably related to the performance of the Plant Superintendent's job. *See Furnco Construction Corp. v. Waters*, 438 U.S. at 578, 98 S.Ct. at 2950. Likewise, it was uncontroverted that the former Plant Superintendent, Starsky, had not had sales or night warehousing experience prior to becoming superintendent. Defendant may have legitimately found Kerner more qualified to be Plant Superintendent than plaintiff. Nevertheless, defendant cannot justify its choice of one candidate over another after the fact by claiming contrary to the facts that the rejected candidate did not possess the minimal qualifications for the promotion. Plaintiff clearly established that he was qualified for the position of Plant Superintendent. In sum, the trial court's finding that he was not qualified is clearly erroneous.

■ 2. The trial court further found that one of the reasons defendant had not selected plaintiff as Plant Superintendent was because in the past he had shown "poor jugment." Defendant never claimed, nor produced evidence to demonstrate, that this was a reason for selecting Kerner over plaintiff for the Plant Superintendent position. Defendant's proffered reason for choosing Kerner was that Kerner's overall qualifications were superior to plaintiff's due to what defendant characterized as greater breadth of experience in the industry. The trial court's addition of a reason for rejecting plaintiff for promotion, not advanced by defendant, nor supported by substantial evidence, is clearly erroneous.

■ 3. One of the instances of "poor judgment" which the trial court erroneously concluded had influenced the defendant's promotion decision was that, in 1976, plaintiff "physically assaulted" an hourly employee named McGee. This finding is not relevant to the promotion issue since defendant never claimed that the incident was a reason for failing to promote plaintiff. It merits detailed attention, however, because it may be relevant to plaintiff's claim of retaliatory discharge.[1]

Insofar as the term "assault" implies aggressive and violent action, no evidence was offered to support this finding. The testimony of the defendant's own witness, John McCullum, defendant's union steward and an eye witness to the event, contradicts any such finding. McCullum described McGee as first being insubordinate to plaintiff, then becoming angry and finally advancing on plaintiff in a threatening manner. McCullum reported that when McGee had advanced close to plaintiff, plaintiff grabbed McGee and pushed him away. McCullum further testified that had he been plaintiff, he would have hit McGee, implying that plaintiff, far from assaulting McGee, had shown restrain in dealing with the situation. No union grievance was ever filed. The matter was resolved in a

---

1. Defendant offered this 1976 episode as one reason to justify its discharge of plaintiff for the parking lot incident in November of 1980. The erroneous characterization of the 1976 incident with McGee as an "assault" is relevant to plaintiff's attempt to demonstrate pretext.

meeting with Johnson, plaintiff, McGee and McCullum. McCullum testified that Johnson never asked for McCullum's version of the incident. On the basis of the testimony of the only eyewitness to the incident, other than plaintiff, there is no substantial evidence to support the trial court's finding that plaintiff physically assaulted McGee.

■ These factual errors are important because they caused the trial court to erroneously conclude that plaintiff had failed to establish a prima facie case with respect to his claim that he had been discriminatorily denied promotion. Plaintiff did in fact establish a prima facie case: he was a member of a protected group, applied for promotion to a job for which he was qualified and was rejected in favor of Kerner, who had comparable qualifications. The trial court did state in conclusory terms that even had plaintiff established a prima facie case, defendant had introduced legitimate reasons for not promoting plaintiff and plaintiff had failed to prove the reasons were pretextual. However, we are unable to review these conclusions since it is not clear that the trial court was not influenced by its clear error with respect to those facts discussed above, and the related erroneous legal conclusion that plaintiff had failed to establish a prima facie case.

### Retaliatory Discharge

■ The trial court did not directly address the question of whether plaintiff established a prima facie case of employment discrimination regarding his claim of retaliatory discharge. However, a review of that portion of the trial court's opinion persuades this court that the trial court implicitly found that plaintiff had failed to establish a prima facie case of retaliation.

2. One of these employees, Beth Alexander, testified that there was no basis for these charges.

3. We note that there is no question that plaintiff had engaged in protected activity, that defendant knew of this activity and that plaintiff suffered from an adverse employment decision.

4. For example, the trial court relied in part on the length of time between defendant's filing his discrimination charge on July 12, 1978, and his

We find error in this conclusion. Plaintiff's burden with respect to establishing a prima facie case is not onerous. *Texas Department of Community Affairs v. Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. He need only introduce evidence from which an inference can be drawn that he would not have been discharged had he not filed discrimination charges. *Cf. Id.* at 254, 101 S.Ct. at 1094. Plaintiff produced evidence that, following the filing of charges, he was removed from his office, excluded from production meetings, and that defendant's general manager improperly attempted to persuade two female employees to file sexual harassment charges against plaintiff.[2] Plaintiff further introduced evidence raising an inference that the incident triggering discharge was not carefully investigated and that defendant on other occasions had treated similar incidents more leniently with other employees. Minimally, this evidence was sufficient to create an inference of a casual connection between plaintiff's filing of discrimination charges and his discharge from employment after 29 years in defendant's service.[3]

■ We are mindful that the trial court may have found that despite this inference, plaintiff had ultimately failed to prove that defendant's proffered legitimate reason was pretextual. However, the trial court's non-recognition of any inference of retaliatory motive leaves us unable to review its weighing and balancing of the evidence bearing on the retaliation issue.[4] The trial court correctly noted that plaintiff is not shielded from legitimate discipline because he filed a charge of discrimination. *See Brown v. Ralston Purina Company*, 557 F.2d 570, 572 (6th Cir.1977). However,

discharge on December 1, 1980, making it unlikely that the two incidents were causally related. *See Hochstadt v. Worcester Foundation for Experimental Biology*, 425 F.Supp. 318, 324 (D.Mass.1976), *aff'd* 545 F.2d 222 (1st Cir.1976). This reliance makes it clear that the trial court ignored evidence introduced by plaintiff, which if believed, would raise an inference that defendant had engaged in a pattern of retaliatory conduct beginning soon after plaintiff filed discrimination charges.

an employer may not use what theoretically may be a legitimate cause for discipline as a pretext for what is in reality retaliation against an employee for engaging in activity protected under Title VII. The trial court in this case appears to have rejected plaintiff's retaliation claim on the grounds that an employer would be justified in discharging an employee for the defendant's proffered reason, the parking lot incident. Whether the trial court was correct or not in this finding is not the issue. The correct inquiry is whether defendant in fact fired him for this reason. Once plaintiff established a prima facie case, he was entitled to the opportunity to demonstrate that the proffered nondiscriminatory reason was not, in fact, the reason he was discharged. *Aikens*, 103 S.Ct. at 1482, n. 5. We find that plaintiff introduced sufficient evidence to raise a factual question concerning pretext. We cannot be assured that the plaintiff's attempt to demonstrate pretext was fairly considered when the trial court did not acknowledge plaintiff's prima facie case of retaliatory discharge. The plaintiff may have lost his case at trial because the district court erred in failing to recognize his prima facie case. Additionally, as noted previously, we cannot be certain that the trial court was not influenced in its determination of the defendant's true motivation by its erroneous factual finding that plaintiff had, in 1976, physically assaulted another employee.

### Plaintiff's Section 1981 Claim

With respect to plaintiff's claim under 42 U.S.C. § 1981, the trial court stated:

"Plaintiff introduced no evidence to establish intent to discriminate. Therefore, plaintiff's claims under 42 U.S.C. § 1981 fails for lack of this proof."

Section 1981 provides:

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and extractions of every kind, and to no other."

Purposeful discrimination is a prerequisite to liability under section 1981. *General Building Contractors Assoc., Inc. v. Pennsylvania, et al.*, 458 U.S. 375, 388–389, 102 S.Ct. 3141, 3148–49, 73 L.Ed.2d 835 (1982). We find error, however, in the trial court's conclusion that plaintiff introduced no evidence of intent to discriminate. The trial court's rationale for reaching that conclusion was not explained and is not otherwise evident. As noted, plaintiff established a prima facie case of both discrimination in promotion and retaliatory discharge violative of Title VII, raising a rebuttable presumption that he was denied promotion and/or discharged because of intentional discrimination. Plaintiff's evidence establishing a prima facie case under Title VII satisfied his prima facie evidentiary burden with respect to his section 1981 claim. *See, e.g., Kenyatta v. Bookey Packing Company*, 649 F.2d 552 (8th Cir.1981); *Person v. J.S. Alberici Construction Co. Inc.*, 640 F.2d 916 (8th Cir. 1981). Discriminatory intent may be established by any evidence logically supporting an inference of that intent. *Detroit Police Officers Ass'n v. Young*, 608 F.2d 671 (6th Cir.), *cert. denied*, 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1979). Plaintiff was not required to produce direct evidence of discriminatory intent. *See Aikens*, 103 S.Ct. 1478; *Burdine*, 540 U.S. at 253, 101 S.Ct. at 1093.

In addition to the rebuttable presumption created by plaintiff's prima facie case on both his failure to promote and retaliatory discharge claims which gave rise to an inference of intentional discrimination, plaintiff introduced other evidence that would support such an inference. Beth Alexander testified that Johnson, defendant's general manager, attempted to persuade Alexander to sign a sexual harassment charge against plaintiff, and that Johnson told her signing that charge would put an end to plaintiff's "trouble making." Alexander

testified that she believed that Johnson was urging that she and Cowell file sexual harassment charges because Jackson had filed this suit. Additionally, the testimony of Burton Calif would give rise to an inference of discriminatory intent. Calif, an employee of defendant, was promoted to a position as production supervisor in 1979 and reported to plaintiff prior to plaintiff's discharge. Calif testified that plaintiff was excluded from production meetings during the period following plaintiff's filing of discrimination charges and prior to his discharge.

The foregoing is not necessarily the only evidence plaintiff introduced of intent to discriminate, but it is illustrative of the error in the trial court's conclusion that plaintiff introduced no such evidence. The trial court may have thought plaintiff was required to produce direct evidence of discriminatory intent; it may have rejected plaintiff's evidence as not worthy of belief, or found that defendant's evidence that it did not discriminate outweighed the evidence introduced by plaintiff. Whatever its basis, the trial court's conclusion that plaintiff introduced no evidence of discriminatory intent is in clear error.

## CONCLUSION

In focusing on the trial court's failure to recognize plaintiff's prima facie case with respect to both of plaintiff's Title VII claims, as well as his claim under section 1981, we are aware that the Supreme Court has cautioned that the ultimate question is whether plaintiff has proved discrimination on the part of defendant by a preponderance of the evidence. *Aikens*, 103 S.Ct. at 1482. However, the Court also recognized that erroneous conclusions regarding the nature of plaintiff's burden may render the trial court's resolution of the ultimate issue not ripe for proper review. *Id.* at 1483. We find this to be the case in the instant action. Because of the trial court's erroneous factual and legal conclusions, we are unable to determine whether those conflicts were properly resolved. *Cf. Deal v. Cincinnati Board of Education*, 369 F.2d

55 (6th Cir.1966), *cert. denied* 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967).

This is particularly true because the district court failed to recognize that Jackson had made a prima facie case, with respect to both his Title VII claims and Section 1981 claim. This distorted its fact finding process in determining whether the defendant articulated a nondiscriminatory reason sufficient to rebut the inference of discriminatory intent the plaintiff had established. See *Wells v. Gotfredson Motor Co., Inc.*, 709 F.2d 493, 498 (8th Cir.1983) (Lay, C.J., dissenting). We find vacating the judgment and remand to be the appropriate disposition. *U.S. Postal Service v. Aikens, supra.* In *Pullman Standard*, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66, the Supreme Court was faced with a similar problem. The Court of Appeals had concluded that the district court committed an error of law in failing to consider relevant evidence with respect to the motive of one union involved in establishing a seniority system challenged under Title VII. The Court of Appeals then made an independent consideration of the record and determined that the defendant unions had acted with discriminatory intent. The Supreme Court reversed the Court of Appeals holding that when a district court's ultimate finding as to discriminatory intent is set aside for errors of law, the case must be remanded to the fact finding tribunal. The Court explained:

> "When an appellate court discerns that a district court has failed to make a finding because of an erroneous view of the law, the usual rule is that there should be a remand for further proceedings to permit the trial court to make the missing findings ... Likewise, where findings are infirm because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue."

*Id.* at 291–2, 102 S.Ct. at 1791 (Citations omitted)

Accordingly, the decision below is reversed. The judgment is vacated, and the case is remanded to the district court for

further proceedings consistent with this opinion, including the taking of additional evidence, if necessary.